UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MELBOURNE RIDGE, JR.,

                          Plaintiff,

           -against-

MICHAEL G. DAVIS, EMMANUEL LEON-
MARTINEZ, YERMIA SOLOMON, DAVID A.
LINDSAY, and DILLON A. OTTINO,

                       Defendants.
------------------------------------------------------------X

**OPINION AND ORDER**

18 Civ. 8958 (JCM)

       Plaintiff Melbourne Ridge ("Plaintiff"), proceeding *pro se*, brings this action pursuant to

42 U.S.C. § 1983 against Defendants Detective-Sergeant Michael G. Davis ("Davis"), Officer

Emmanuel Leon-Martinez ("Leon-Martinez"), Officer Yermia Solomon ("Solomon"), Sergeant

David A. Lindsay ("Lindsay"), and Detective Dillon A. Ottino ("Ottino") (collectively,

"Defendants"). (Docket Nos. 2, 37).  Plaintiff filed an amended complaint on July 18, 2019

("Amended Complaint"). (Docket No. 37).  Defendants moved for summary judgment pursuant

to Rule 56 of the Federal Rules of Civil Procedure ("Motion"). (Docket No. 93).  Plaintiff

opposed the Motion, (Docket No. 100), and Defendants replied, (Docket No. 102).  For the

reasons set forth below, the Court grants in part and denies in part Defendants' Motion.[1]

## I.  BACKGROUND

       The following facts are gathered from Defendants' Rule 56.1 Statement of Material

Facts, (Docket No. 97), Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary

---

[1] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 87).

Judgment,[2] (Docket No. 100), the exhibits attached to the parties' submissions, and the affidavits submitted by Defendants in support of their contentions. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018). The facts are not in dispute, unless otherwise noted.

This action concerns the events leading up to Plaintiff's arrest by the Village of Monticello Police Department and subsequent medical treatment on October 26, 2016 in Monticello, New York. (Docket Nos. 97 ¶ 23; 100 ¶ 3).

## A. The Arrest

At approximately 2:05 p.m. on the date of the incident, Lindsay and Solomon[3] responded to a call reporting a burglary at 14 Bennett Street. (Docket Nos. 97 ¶ 25; 94-11 ¶ 2). When they arrived, Plaintiff was standing along the side of the road over a pile of copper pipes.[4] (Docket Nos. 97 ¶ 25; 94-11 ¶ 2; *see also* Docket Nos. 37 ¶ 1; 106-1[5] at 27:1-4). As Lindsay and

---

[2] Plaintiff's response to Defendants' Rule 56.1 Statement is presented as an affidavit with numbered paragraphs that address the factual contentions in each separately numbered paragraph in Defendants' Rule 56.1 Statement. (*See* Docket Nos. 97; 100 at 1-2). Although the affidavit disputes several of Defendants' contentions, it does not explain the factual bases for these disputes or cite to any supporting evidence. (*See* Docket No. 100 at 1-2). Therefore, Plaintiff has not complied with Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York or Federal Rule of Civil Procedure 56(c) in that he failed to "include . . . correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of [Defendants]," and did not cite admissible evidence following "each statement controverting [Defendants'] statements of material fact." *See* Local Civil Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c). However, Plaintiff testified about the incident on which his lawsuit is based in a deposition transcript attached by Defendants. (Docket No. 106-1). Plaintiff also references an exhibit attached to the Amended Complaint in the legal argument section of his opposition. (Docket No. 100 at 7; *see also* Docket No. 37 at 9-10). In light of the "liberal treatment afforded [to] pro se litigants[,] . . . particularly at summary judgment[,]" the Court considers this evidence and the entire record to resolve Defendants' motion. *See Aikens v. Jones*, No. 12 Civ. 1023(PGG), 2015 WL 1262158, at *1 n.2 (S.D.N.Y. Mar. 19, 2015); *see also Melendez v. DeVry Corp.*, No. 03-CV-1029 (NGG) LB, 2005 WL 3184277, *2 (S.D.N.Y. Nov. 29, 2005) (examining "the entire record[,] . . . glean[ing] the material facts therefrom, and decid[ing] the motion based on those facts" despite *pro se* plaintiff's failure to comply with Local Rule 56.1).

[3] At all times relevant to this action, all Defendants were employed by the Village of Monticello Police Department. (Docket Nos. 97 ¶¶ 18-22; 100 ¶¶ 3, 6).

[4] According to Plaintiff, he intended to load the copper into his car and use it for "scrap." (Docket No. 106-1 at 29:3-13).

[5] All page number citations to the record refer to the ECF page number unless otherwise noted.

Solomon approached Plaintiff in their patrol vehicles, Plaintiff crossed the street and walked toward his parked car. (Docket Nos. 94-11 ¶ 2; 97 ¶ 26; 100 ¶ 7).  At least one of the officers exited his patrol vehicle and instructed Plaintiff to stop and return, but Plaintiff did not. (Docket Nos. 94-11 ¶ 2; 97 ¶ 26; 100 ¶ 7; 106-1 at 33:12-20).  Plaintiff began to run into a wooded area with both officers pursuing him on foot.[6] (Docket Nos. 94-11 ¶ 3; 97 ¶¶ 26-27; 100 ¶¶ 7-8). According to Plaintiff, after he started running, Solomon said "he was gonna kick my ass." (Docket No. 106-1 at 33:24-34:22).

The parties dispute what happened next.  Defendants assert that Lindsay and Solomon continued to call out to Plaintiff to stop running, stating that he was under arrest, to no avail. (Docket Nos. 94-11 ¶ 3; 97 ¶ 27; 100 ¶ 8).  Plaintiff ran toward a fence, at which point Lindsay used his taser once, from a twelve-foot distance. (Docket Nos. 94-11 ¶ 3; 97 ¶ 28).  However, the taser was ineffective because Lindsay was "not able to make contact with both probes." (Docket Nos. 94-11 ¶ 3; 97 ¶ 28).  Plaintiff then climbed over the fence. (Docket Nos. 94-11 ¶ 3; 97 ¶ 29).  By the time Lindsay did the same, he had lost sight of Plaintiff because of the thick brush and vegetation. (Docket Nos. 94-11 ¶ 3; 97 ¶ 29).  Thus, Lindsay stopped running and reported Plaintiff's flight on the police radio, and included Plaintiff's approximate location, his clothing, and that he was running towards the Mountain Mall on East Broadway.[7] (Docket Nos. 94-11 ¶ 3; 97 ¶ 30).  Lindsay and Solomon did not see Plaintiff again until they learned over the radio that Plaintiff was in custody at the Butcher Boys store, at which point they returned to their vehicles and drove to that location. (Docket No. 94-11 ¶ 3).

---

[6] Plaintiff testified that he ran away due to an existing warrant for his arrest. (Docket No. 106-1 at 36:22-23).

[7] The Mountain Mall is a "strip mall" on East Broadway that contains various shops. (Docket Nos. 94-11 ¶ 3; 97 ¶ 27).

Defendants further assert that shortly after the incident was reported, Davis, who was on duty at the police station, learned from the dispatcher that a burglary suspect was attempting to evade arrest by fleeing from other officers and was heading toward the Mountain Mall. (Docket Nos. 94-12 ¶ 2; 97 ¶ 31).  Davis drove to the area and observed Plaintiff cutting through a parking lot. (Docket Nos. 94-12 ¶ 2; 97 ¶ 32).  Davis then exited his vehicle and began pursuing Plaintiff on foot behind the Butcher Boys store. (Docket Nos. 94-12 ¶ 2; 97 ¶ 32; 100 ¶ 9).

Meanwhile, Leon-Martinez, who was also on patrol, heard about the pursuit over the police radio and began driving toward the Mountain Mall. (Docket Nos. 94-13 ¶ 2; 97 ¶ 33). While en route, he decided to drive to the Butcher Boys store because he heard on the radio that Plaintiff had run there. (Docket Nos. 94-13 ¶ 2; 97 ¶ 34).  When Leon-Martinez arrived, he saw Davis pursuing Plaintiff, drove to the opposite side of the store, exited his vehicle, and began pursuing Plaintiff, too. (Docket Nos. 94-13 ¶ 2; 97 ¶ 34).

When Plaintiff saw Leon-Martinez, he changed directions and ran through a wooded area with "thick bushes and debris." (Docket Nos. 94-12 ¶ 2; 94-13 ¶ 2; 97 ¶ 35).  However, Plaintiff fell backwards when trying to climb another fence so Leon-Martinez was able to grab him. (Docket Nos. 94-12 ¶ 2; 94-13 ¶ 2; 97 ¶ 35).  They both fell to the ground. (Docket Nos. 94-12 ¶ 2; 94-13 ¶ 2; 97 ¶ 35).  According to Defendants, Plaintiff resisted arrest. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 97 ¶ 36).  However, after a brief struggle, Leon-Martinez successfully handcuffed Plaintiff. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 97 ¶ 37).  Davis and Leon-Martinez assert that Leon-Martinez did not hit or kick Plaintiff while handcuffing him or anytime thereafter. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 97 ¶ 39).  Davis also contends that he did not use force against Plaintiff, and said that his only physical contact with Plaintiff was helping Leon-Martinez stand him up and escort him to the police car after he was already handcuffed, a process which

4

occurred without incident. (Docket No. 94-12 ¶ 3; *see also* Docket Nos. 94-13 ¶¶ 3-4; 97 ¶¶ 38, 40).  Leon-Martinez then drove Plaintiff to the police station. (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 4; 97 ¶ 40).  Defendants assert that Ottino, Lindsay and Solomon were not present when Plaintiff was handcuffed and put into Leon-Martinez's vehicle,[8] and therefore, had no physical contact with him. (Docket Nos. 94-11 ¶ 4; 94-12 ¶ 3; 94-13 ¶ 3; 94-14 ¶ 2; 97 ¶¶ 41, 44).

Plaintiff admitted at his deposition that when Solomon and Lindsay started pursuing him, he ran through wooded "back yards" and a parking lot, and ended up behind the Butcher Boys store. (Docket No. 106-1 at 36:24-37:18).  However, he testified that contrary to Defendants' claims, Ottino joined the pursuit when he reached the parking lot, shortly before Leon-Martinez's arrival. (*Id.* at 42:13-44:18, 46:2-48:9).  Furthermore, Plaintiff denied that he ever had "difficulty jumping or climbing over [a] fence," and maintained that he encountered only one fence, not two. (*Id.* at 41:7-17).  Plaintiff also maintains that he was not tased by Lindsay until he reached the back of the store – not in the wooded area as Defendants assert – and the taser's two probes left scars on the right side of his head and his upper right shoulder.[9] (*Id.* at 37:19-23, 40:21-41:3, 48:10-12, 52:20-22, 89:16-22, 91:8-15; *see also* Docket Nos. 97 ¶ 28; 100 ¶ 3). Plaintiff additionally asserts that he was "assaulted by several officers" behind the store and was eventually placed in handcuffs. (Docket No. 106-1 at 36:6-21, 37:4-18, 48:10-20).  Plaintiff

---

[8] Specifically, according to Defendants, Ottino was off duty on the date of the incident, and did not get involved until after Plaintiff was arrested, when Davis requested that he work overtime at the police station to assist in gathering and processing evidence. (*See* Docket No. 94-14 ¶ 2).  Defendants assert that Plaintiff was already in custody at the police station when Ottino arrived. (Docket Nos. 94-12 ¶ 5; 94-14 ¶ 2; 97 ¶ 44).  According to a timesheet submitted by Defendants, Ottino started working at approximately 3:00 p.m. and stopped at approximately 9:30 p.m. (Docket No. 94-5).  As for Lindsay and Solomon, they maintain that they arrived at the Butcher Boys store when Plaintiff was already in Leon-Martinez's vehicle. (Docket Nos. 94-11 ¶ 4; 94-12 ¶ 3; 97 ¶ 43).

[9] Plaintiff initially testified that he was tased specifically after he dropped to his knees in surrender. (Docket No. 106-1 at 50:5-11).  However, in his deposition, Plaintiff stated that he "could have been" tased "while [he] was running, it could have been while [he] was on [his] knees, but [he] believe[d] [he] was tased prior to the assault." (*Id.* at 53:21-54:1).

claims he was "brutally . . . kicked, kicked in the face by . . . Leon-Martinez" and punched in the "upper back of the head." (*Id.* at 44:19-45:5, 48:14-15).  He also "felt other officers" "hitting" and "kicking" him,[10] but cannot identify them because his face was pressed to the ground. (*Id.* at 60:24-62:1).  Plaintiff testified that Davis may have participated in the beating, because Plaintiff saw him behind the store before losing consciousness, and the first thing Plaintiff saw when he "woke up" was Davis "dragg[ing]" him into a police vehicle with Leon-Martinez's help.[11] (*Id.* at 49:11-20, 57:15-17, 59:23-60:8).  Plaintiff explained that immediately before the "assault," he "dropped to [his] knees" and lay down because he "realized [he] was surrounded." (*See id.* at 50:5-11, 51:15-20, 54:14-17).  Moreover, for at least a portion of his alleged beating, he claims he was already handcuffed. (*See id.* at 51:19-20).  Plaintiff asserts that none of the Defendants told him that he was under arrest until he was actually arrested. (*Id.* at 50:24-51:5).

Plaintiff also disputes Defendants' assertions that Leon-Martinez and Davis were the only ones who participated in arresting Plaintiff behind the store. (*See* Docket Nos. 97 ¶ 41; 100 ¶ 4).  Plaintiff testified that although he lost consciousness when he was kicked, Lindsay and Solomon[12] were also present when he dropped to his knees. (Docket No. 106-1 at 48:24-49:15, 51:6-11, 58:24-59:3).  At one point during Plaintiff's deposition, he conceded that he did not see Ottino behind the store before he was kicked, but maintained that Ottino was also present while he was assaulted because he saw Ottino both before he reached the parking lot, and after he was apprehended and had regained consciousness.[13] (*Id.* at 56:16-57:7, 62:12-24).  Later in his

---

[10] Plaintiff explained that "[i]t felt like it was more than" one person assaulting him and "it was like a gang kind of assault." (*Id.* at 61:21-62:1).

[11] According to Plaintiff, Davis stated: "[Y]ou shouldn't have made me run like that, asshole." (*Id.* at 57:12-17).

[12] According to Plaintiff, Lindsay and Solomon had caught up with Plaintiff by the time he reached the back of the store. (*Id.* at 48:24-49:15).

[13] Plaintiff alleges that Ottino "follow[ed]" him "across the street" toward the back of the store. (*Id.* at 62:12-19).

deposition, however, Plaintiff testified that he saw Ottino with Davis behind the store *before* he lost consciousness, ten to fifteen feet away. (*Id.* at 63:1-15).

Plaintiff does not dispute that after being handcuffed, he was placed into a police vehicle and Leon-Martinez drove him to the police station. (Docket Nos. 97 ¶ 45; 100 ¶ 11).

### B.  Processing at the Police Station and Medical Treatment

Plaintiff concedes that he did not complain of any injuries or request medical care during the drive to the police station. (Docket Nos. 94-13 ¶ 4; 97 ¶ 45; 106-1 at 65:20-66:8).  Neither Leon-Martinez nor Davis observed any injuries on Plaintiff. (Docket Nos. 94-12 ¶ 4; 94-13 ¶ 4; 97 ¶ 46).  Nevertheless, as a precaution, Davis instructed Leon-Martinez to contact Mobile Medic to conduct a medical examination of himself[14] and Plaintiff upon arrival at the police station. (Docket Nos. 94-12 ¶ 4; 94-13 ¶ 4; 97 ¶ 46).

Records from Mobile Medic indicate that they received Leon-Martinez's call at 2:15 p.m. and arrived at the police station at 2:18 p.m. (Docket No. 94-6 at 4).  The records also reflect that Plaintiff "initially refused any exam/treatment" and signed a Refusal of Medical Attention form as well as a release. (*Id.* at 2-4).  However, Plaintiff permitted an examination at 2:22 p.m., appearing alert and oriented and demonstrating "[r]egular" respiration as well as normal movement in his extremities. (*Id.* at 4).  The "Physical Assessment" and "Comments" reflect that Plaintiff had a "scratch on [the] bridge of [his] nose" and that his left eye "appear[ed] to have a broken blood vessel," but Plaintiff "denie[d] p[ai]n,"[15] had "mild blurred vision," and had "no apparent leakage of visceral fluid." (*Id.*).  Plaintiff had scratches on his right wrist close to his

---

[14] Leon-Martinez sustained a laceration above his left eyebrow that also needed treatment. (Docket Nos. 94-12 ¶ 4; 94-13 ¶ 4; 97 ¶ 46).

[15] Plaintiff's "[c]hief [c]omplaint" was: "I want to know why I have been arrested!" (*Id.*).

handcuffs. (*Id.*).  His scratches were cleaned and bandaged. (*Id.*).  Plaintiff was advised that "if he was released to have his doctor or [the emergency room] look at his eye," and that "if anything changed to call [Mobile Medic] back." (*Id.* at 5).

About four hours after the initial examination, Davis interviewed Plaintiff for approximately forty-three minutes[16] with Ottino present. (Docket Nos. 94-8; 94-12 ¶ 5; 94-14 ¶ 3).  Davis and Ottino assert that between the medical examination and the start of the interview, Plaintiff did not complain of any injuries or request further medical treatment. (Docket Nos. 94-12 ¶ 5; 94-14 ¶ 3; 97 ¶ 51).  However, they concede that during the interview, Plaintiff "generally complained about his eye." (Docket No. 97 ¶ 52; *see also* Docket Nos. 94-12 ¶ 5; 94-14 ¶ 3).  Indeed, a video of the interview reflects that Plaintiff intermittently expressed discomfort in his eye area five times, at approximately 6:48 p.m., 6:55 p.m., 7:03 p.m., 7:21 p.m. and 7:24 p.m. (Docket No. 94-8; *see supra* n.16).  The first three times, at 6:48 p.m., 6:55 p.m. and 7:03 p.m., Plaintiff complained that he had unusual sensations and pain in his eye area, but did not request further treatment. (Docket No. 94-8).  At approximately 7:19 p.m., a substance that Plaintiff identified as blood dripped from the left side of his face onto his hand, which prompted Davis to get him a tissue. (*Id.*).  Plaintiff wiped his face and at 7:21 p.m., complained that his eye "hurt." (*Id.*).  In response, Davis asked Plaintiff if he wished to be examined by the medics again, and Plaintiff responded, "I told you, I need to go to the hospital." (*Id.*; *see also* Docket No. 94-12 ¶ 6).  Davis then advised Plaintiff that he would arrange for medical treatment and that in the meantime, Plaintiff could speak to his partner on the phone. (Docket No. 94-8).

---

[16] A video of the interview at the precinct reflects that it began at 6:42 p.m. and concluded at 7:25 p.m. (Docket No. 94-8; *see also* Docket No. 94 ¶ 9).  When the interview ended, Plaintiff spoke with his partner on the phone for approximately nine minutes, until 7:34 p.m. (Docket No. 94-8).  This phone conversation was also captured on video. (*Id.*).  An electronic version of the video was delivered to the Court and served on Plaintiff. (Docket No. 95).

At 7:24 p.m., Plaintiff stated: "I feel like I just made it worse." (*Id.*). However, throughout the interview and Plaintiff's subsequent phone call, Plaintiff was able to hold a cogent conversation while sitting comfortably in a chair, and appeared to be in only mild physical distress. (*Id.*).

According to Plaintiff, upon arriving at the police station and before the interview, he was placed in a holding cell for "a while [sic], at least an hour"[17] and "experience[d] some, a lot of pain." (Docket No. 106-1 at 66:9-13, 67:2-6). Plaintiff testified that while he was in the cell, he requested medical care from either Davis or Ottino because he "couldn't see out of [his] eye" and at that point, one of these officers "said he's gonna bring a [sic] EMS." (*Id.* at 67:17-68:-17). Plaintiff claims that he did not "complain of an eye injury to anyone at the police station" before the interview because he feared for his safety. (*Id.* at 71:17-72:18). He also maintained that he "did not decline treatment by EMS;" rather, he told Mobile Medic that he "wanted outside treatment" "through a hospital" because he believed Mobile Medic "w[as] representing Monticello Police Department." (*Id.* at 68:18-69:13). Plaintiff conceded that Davis and Ottino "may have offered EMS" and that he ultimately accepted Mobile Medic's treatment, but he also could not recall whether that was before or after the interview, explaining that he believes he was experiencing the symptoms of a concussion. (*Id.* at 70:8-71:6). Moreover, although he was transported to the hospital shortly after the interview, he was "definitely in some pain in the holding cell" and believes that he "should have [been brought] straight to the hospital" rather than being "interrogated." (*Id.* at 73:24-75:6). Once at the hospital, he was given a CAT scan and pain medications. (*Id.* at 78:13-19).

---

[17] Plaintiff also testified that he was shuffled back and forth between the holding cell and the interview room "at least two or three different times," and that he was placed in the holding cell after the interview. (Docket No. 106-1 at 72:19-73:3, 74:11-15).

The Mobile Medic records reflect that they were called back to the precinct at 7:41 p.m., approximately sixteen minutes after the interview ended. (Docket No. 94-6 at 7).  The medics arrived at 7:45 p.m. (*Id.*).  At that point, Plaintiff complained of pain in his left eye, which was "obvious[ly] swollen." (*Id.*).  The medics categorized his "[p]resenting [p]roblem" as "[t]rauma – [b]lunt." (*Id.*).  They then transported Plaintiff to Catskill Regional Medical Center ("Catskill") for further examination, leaving the police station at 7:57 p.m. and arriving at Catskill at 8:07 p.m. (Docket Nos. 94-6 at 7; 97 ¶ 53).

Medical notes from Kristen M. Peace, M.D. at Albany Medical Center ("Albany"), where Plaintiff was transported after Catskill, identify a closed fracture of Plaintiff's left eye socket and a corneal abrasion. (Docket Nos. 101-1; 106-1 at 85:22-86:3).  They also state: "Given the isolated left lamina fracture with likely left medial orbital fracture, with no signs of entrapment, I do not feel there is an urgent need to consult ENT who is on for facial surgery at this time." (Docket No. 101-1).  Plaintiff was given erythromycin as well as tetracaine, and was told to seek further treatment at a "clinic" within five to six days, and "ophthalmology" within one to two days. (*Id.*).  Plaintiff "otherwise denie[d] headache, neck pain, or any other complaints" and reported "significant improvement of his eye[] scratchiness upon application of [the] tetracaine." (*Id.*).  There is no indication that Plaintiff was ever diagnosed with a concussion.

Plaintiff testified that an unnamed physician at Albany recommended a surgical procedure to repair his eye socket by "plac[ing] a metal film around the eye," but he declined it because he "feared for his safety." (Docket No. 106-1 at 85:24-87:19).  After "a few hours," Plaintiff was discharged and transported to Sullivan County Jail. (*See* Docket Nos. 101-1; 106-1 at 87:24-88:4).  Plaintiff alleges that since the incident, he has experienced "frequent" migraines as well as blurred vision, light sensitivity, pain and pressure in his left eye. (Docket No. 106-1 at

80:22-82:11, 88:17-22).  In addition, he needs a stronger prescription for his eyeglasses now. (*Id.* at 88:8-12).  Plaintiff has not been able to schedule the recommended surgery because he is currently incarcerated and "that w[ould] be very difficult to do." (*Id.* at 87:20-23).

On September 8, 2017, Plaintiff was convicted of three counts of felony burglary in the third degree in connection with the above incident. (Docket No. 94-4).  He received a six to twelve-year sentence. (Docket No. 94-10).

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)) (internal quotations omitted).[18]

In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)

---

[18] In accordance with *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Opinion and Order and shall be simultaneously delivered to the *pro se* Plaintiff.

(quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotations omitted).  However, the nonmovant cannot defeat a motion for summary judgment by relying on unsupported assertions, conjecture or surmise. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The nonmovant must also do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotations omitted).  To survive a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467–68 (S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

## III. DISCUSSION

Plaintiff advances three theories of liability against Defendants.  First, Plaintiff appears to argue that Defendants are liable for excessive force in connection with Lindsay's use of the taser, Leon-Martinez's alleged kick, and the alleged assault behind the Butcher Boys store. (Docket Nos. 97 ¶¶ 11-13; 100 at 1 ¶¶ 3-4, 4; 106-1 at 61:21-62:1).  Second, Plaintiff argues that Lindsay, Solomon, Davis and Ottino are liable for failing to intervene when Plaintiff was tased and beaten. (Docket Nos. 97 ¶ 13; 100 at 1 ¶ 3, 9).  Third, Plaintiff argues that both Ottino and Davis are liable for deliberate indifference to Plaintiff's medical needs because they failed to provide medical treatment in a timely fashion. (Docket Nos. 97 ¶ 13; 100 at 1 ¶ 3, 6-9).  The Court addresses each theory in turn.

## A.  Excessive Force

### 1.  Use of the Taser

Defendants assert that Lindsay is entitled to summary judgment with respect to the use of his taser because he deployed it when Plaintiff was attempting to evade arrest, rendering this action objectively reasonable. (Docket Nos. 96 at 5-7; 102 at 9-10).  They also assert that Lindsay is entitled to qualified immunity. (Docket No. 96 at 7-9).  In opposition, Plaintiff argues that there are issues of material fact regarding whether Lindsay's action was reasonable and subject to qualified immunity because Lindsay tased Plaintiff after he had already surrendered and was on the ground. (Docket No. 100 at 3-5).  Plaintiff further argues that the physical evidence of his scars belie Lindsay's version of these events, which is not supported by any evidence except for Lindsay's own affidavit. (*Id.* at 5).  Defendants respond that Plaintiff cannot use his affidavit to create an issue of material fact because his assertions regarding when he was tased contradict his prior deposition testimony. (Docket No. 102 at 9-10).

### i.  Sham Affidavit Rule

The "sham affidavit rule" provides that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."[19] *See Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (summary order) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)) (internal quotations omitted).  However, this rule is inapplicable if (1) the subject "deposition testimony and later affidavit are not actually contradictory," *see Palazzo ex rel. Delmage*, 232 F.3d 38, 43 (2d Cir. 2000); (2) "'there is a

---

[19] The rule seeks to prohibit "a party who has been examined at length on deposition [from] . . . rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony" because "this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969).

readily apparent, plausible explanation' for the inconsistency," *see Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (quoting *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205–06 (2d Cir. 2014)); or (3) the statements at issue are ambiguous but "only arguably contradictory," *see Hayes*, 84 F.3d at 620; *see also In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) ("In the ordinary case where a district court is asked to consider the contradictory deposition testimony of a fact witness, or where the contradictions presented are not 'real, unequivocal, and inescapable,' the general rule remains that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment.'") (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (noting that when "subsequent sworn testimony amplifies or explains, but does not merely contradict . . . [the subject] prior testimony," a party may show that a triable issue of fact exists).  Indeed, "mere tensions or inconsistencies go to credibility, not admissibility, and credibility determinations are not proper at summary judgment." *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 95 (S.D.N.Y. 2020) (citing *Moll*, 760 F.3d at 206).

Here, the statements at issue are only "arguably contradictory." *See Hayes*, 84 F.3d at 620.  Rather than setting forth a completely different version of events than he relayed at his deposition, Plaintiff's affidavit "amplifies" his prior testimony. *See Rule*, 85 F.3d at 1011.  Plaintiff's affidavit states that he was tased when "he dropped to his knees to surrender." (Docket No. 100 at 3-4).  Defendants correctly note that when asked during his deposition if he was tased "while [he was] running or after [he] went to [his] knees," Plaintiff stated: "It could have been while I was running, it could have been while I was on my knees, but I believe I was Tased prior to the assault." (Docket Nos. 102 at 10; 106-1 at 53:21-54:1).  However, at another point in the deposition, Plaintiff also explained: "Once I realized I was surrounded I dropped to my knees

and that's when I believe I was Tased in the head.  I believe I was Tased in the head first, then I was kicked in the eye." (Docket No. 106-1 at 50:5-11).

Viewed as a whole, Plaintiff's testimony regarding the moment when he was tased is ambiguous, but his affidavit is consistent with his statement that he dropped to his knees "and that's when I believe I was Tased." (*Compare* Docket No. 100 at 3-4, *with* Docket No. 106-1 at 50:5-11).  Moreover, the testimony Defendants cite is equivocal, and leaves open the possibility that Plaintiff was tased while on the ground. (Docket Nos. 102 at 10; 106-1 at 53:21-54:1). Thus, any contradiction is not "real, unequivocal, and inescapable." *See In re Fosamax Prod. Liab. Litig.*, 77 F.3d at 194 n.4; *see, e.g.*, *Brandon*, 938 F.3d at 33 n.9 (rejecting sham affidavit argument where plaintiff could not remember the exact number of times he was served pork at his deposition, but later "provided a specific number"); *Fleming v. Costco Wholesale Corp.*, 17-CV-2878 (AMD) (PK), 2020 WL 2404907, at *5 (E.D.N.Y. May 12, 2020) (declining to apply sham affidavit rule where affidavit expressed "certainty" regarding "former ambivalen[t]" testimony).  The inconsistencies here "go more to the reliability of plaintiff as a witness than to the genuineness of any material factual disputes." *See Buie v. City of New York*, No. 12 CV 4390(RJD)(CLP), 2015 WL 6620230, at *4 (E.D.N.Y. Oct. 30, 2015) ("On balance, after reviewing plaintiff's deposition—during which she clearly struggled but nonetheless managed to set forth the basic facts of her surviving claims—the Court readily concludes that while the affidavit may undermine her credibility before the jury it is of no real consequence in the Court's determination of the motion.").  Consequently, the Court will not preclude Plaintiff from relying on his affidavit at this stage.

## ii.  Merits

It is well-established that under the Fourth Amendment, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to

effect it." *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotations omitted).  However, "law enforcement officers violate the Fourth Amendment if the amount of force they use is '"objectively unreasonable" in light of the facts and circumstances confronting them.'" *Id.* (quoting *Graham*, 490 U.S. at 397).  Determining whether an officer's use of force is reasonable is a fact-intensive inquiry, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Because officers must often "make split-second judgments" about "the amount of force that is necessary," the reasonableness of the amount of force used "must be judged from the perspective of a reasonable officer on the scene." *See id.* at 396–97.  Thus, "the factfinder must determine whether, in light of the totality of the circumstances faced by the arresting officer, the amount of force used was objectively reasonable at the time." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  Officials are "entitled to qualified immunity . . . [when] their decision was reasonable, even if mistaken." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  Indeed, "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).  To analyze a qualified immunity defense on summary judgment, courts ask "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional

16

right, and (2) whether that right was clearly established at the time of the alleged violation."
*Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). "In the excessive force context, 'the question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.'"
*Read v. Town of Suffern Police Dep't*, No. 10 Civ. 9042(JPO), 2013 WL 3193413, at *7 (S.D.N.Y. June 25, 2013) (quoting *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995)).

Defendants assert that Lindsay's use of the taser once was reasonable because Plaintiff, who was eventually convicted of three counts of felony burglary, was running away from Lindsay in the direction of the Mountain Mall, and thus, posed a threat to other officers and the public. (*See* Docket No. 96 at 6-7). As a general matter, it is true that "the use of force may be reasonable against a suspect who is fleeing." *Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017). However, such force "may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight." *Id.* (citing *Tracy*, 623 F.3d at 96–98). Moreover, the only support for Defendants' contention that the fleeing suspect doctrine applies is Lindsay's self-serving affidavit – which is in direct conflict with Plaintiff's own affidavit and testimony. (Docket Nos. 100 at 3-4; 106-1 at 50:5-11; *see also* Docket No. 94-11). Plaintiff alleges that he was tased when he attempted to surrender by "dropp[ing]" to his "knees on the ground." (Docket No. 100 at 3-4; 106-1 at 50:5-11). Indeed, Plaintiff testified at his deposition that before he was tased, he "got down" because he realized he was "surrounded" by officers and "didn't want to appear threatening." (Docket No. 106-1 at 50:5-11, 51:14-19, 58:3-5). He further testified that he did not resist arrest, or punch or strike any officers. (*Id.* at 54:24-55:4). Furthermore, Plaintiff claims that he has "noticeable" scars from Lindsay's taser, which could constitute physical

evidence that contrary to Lindsay's assertions, the taser was deployed effectively in two places.[20] (Docket No. 106-1 at 89:16-90:3, 91:8-15).

In light of the above evidence and the parties' contradictory accounts, a reasonable jury could conclude that Lindsay tased Plaintiff when he was no longer evading arrest, and therefore, this use of force was excessive and unreasonable. *See, e.g.*, *Tracy*, 623 F.3d at 96–98 (finding material issues of fact where plaintiff claimed officer used pepper spray after plaintiff told him he was not resisting); *Diaz v. City of Hartford Police Dep't*, 3:18-CV-01113 (KAD), 2021 WL 1222187, at *6 (D. Conn. Mar. 31, 2021) (finding dispute of material fact regarding excessive force claim where plaintiff testified that he "fully surrendered" before being beaten, punched, kicked and tased); *Zachary v. City of Newburgh*, 13 CV 5737 (VB), 2016 WL 4030925, at *9 (S.D.N.Y. July 25, 2016) (denying summary judgment "[e]ven though plaintiff was physically fighting officers just moment before" because "a jury could reasonably conclude plaintiff was subdued prior to being tased"); *Odom v. Matteo*, 772 F. Supp. 2d 377, 389 (D. Conn. 2011) (denying summary judgment where "[g]iven the competing affidavits submitted by the parties, the jury could construe Odom's conduct as . . . attempting to comply subject to limitations caused by her brain injury").  Thus, there is a genuine dispute of material fact about when Lindsay deployed his taser that precludes the Court from finding his conduct objectively reasonable as a matter of law.

Moreover, the Court cannot grant Lindsay summary judgment on qualified immunity grounds.  As of the date of the incident, it was clearly established within this Circuit "that tasing and physically assaulting an individual who was not actively resisting arrest or posing an

---

[20] Although the booking photograph that Plaintiff references in support of this allegation is not clear enough to show any scars, in light of Plaintiff's *pro se* status and the paucity of evidence in this record, the Court credits it for purposes of the Motion because Plaintiff attested to the scarring under oath and a jury could observe the scars in court. (*See* Docket Nos. 100 at 7; 37 at 9-10).

immediate threat to officers constitute[s] excessive force." *See Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *18 (D. Conn. July 2, 2019); *see also Tracy*, 623 F.3d at 98; *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 297 (S.D.N.Y. 2014), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015). In light of this precedent, and because there is a genuine issue of material fact as to whether Lindsay tased Plaintiff after he had surrendered, qualified immunity does not apply. *Cf. Read*, 2013 WL 3193413, at *7–8. Accordingly, Defendants' motion for summary judgment with regard to Lindsay's use of the taser is denied.

**2. Assault**

Construing Plaintiff's arguments liberally, Plaintiff also asserts excessive force claims against Leon-Martinez for kicking him in the face, causing a broken eye socket, and all of the Defendants for participating in a "gang kind of assault" in which he was hit and kicked both before and after being handcuffed. (Docket Nos. 97 ¶¶ 11-13; 100 ¶¶ 3-4 at 1, 4; 106-1 at 51:19-20, 61:21-62:1; *cf.* Docket No. 37 at 5 ¶ 5, 6-7). Defendants dispute that these events occurred. (Docket Nos. 96 at 13 n.7; 97 ¶¶ 41-44). They further respond that Plaintiff cannot maintain an excessive force claim against Leon-Martinez because to the extent he used force, such force was necessary and Plaintiff had no observable injuries. (Docket No. 96 at 13-14 n.7; *see also* Docket No. 94-13 ¶ 4). Defendants also dispute that the Amended Complaint asserts an excessive force claim against the other officers, and in any event, they argue that such a claim must be dismissed because the evidence establishes that Solomon, Lindsay and Ottino were not present when Plaintiff was apprehended and handcuffed, and Davis was "not involved" in the process of handcuffing Plaintiff. (*See id.*).

Defendants' arguments with respect to Leon-Martinez fail for the same reasons as their contentions regarding Lindsay's use of the taser. Although Defendants claim that Leon-Martinez

never hit or kicked Plaintiff, (Docket Nos. 94-12 ¶ 3; 94-13 ¶ 3; 96 at 13-14 n.7), Plaintiff

disputes this and claims that Leon-Martinez kicked him in his left eye when he had already

surrendered, (Docket No. 106-1 at 54:2-23, 55:5-10).  Moreover, it is undisputed that Plaintiff

was diagnosed with a broken left eye socket when he was transported to the hospital later that

day. (Docket No. 101-1).  Plaintiff further testified that after Leon-Martinez kicked him, he felt

himself being hit and kicked again, but could not discern which officer did so because his head

was facing the ground. (Docket No. 106-1 at 61:9-62:1).

In light of this evidence, there are clearly material issues of fact on whether Leon-

Martinez used excessive force, which preclude the Court from granting summary judgment. *See*

*Diaz*, 2021 WL 1222187, at *6; *supra* Section III.A.1.ii.  Even by Defendants' account, Plaintiff

and Leon-Martinez engaged in a "brief struggle" before Leon-Martinez handcuffed him. (Docket

Nos. 94-12 ¶ 3; 94-13 ¶ 3).  Accordingly, a jury could reasonably conclude that Leon-Martinez

used excessive force against Plaintiff. *See Diaz*, 2021 WL 1222187, at *6.  The Court therefore

denies Defendants' motion for summary judgment with respect to Plaintiff's excessive force

claim against Leon-Martinez.

The Court will now turn to whether Plaintiff makes out a claim of excessive force against

Davis, Lindsay, Ottino and Solomon for the alleged "gang kind of assault." (Docket No. 96 at 13

n.7; *see also* Docket No. 106-1 at 61:21-62:1).  "An individual defendant is not liable under §

1983 absent personal involvement." *See Walker v. Raja*, No. 17-CV-5202 (PKC) (LB), 2020 WL

606788, at *4 (E.D.N.Y. Feb. 7, 2020) (quoting *Morris v. Eversley*, 282 F. Supp. 2d 196, 202

(S.D.N.Y. 2003)) (internal quotations omitted).  The Amended Complaint specifically identifies

only Lindsay and Leon-Martinez as using unlawful force against Plaintiff, and only mentions the

other Defendants in the context of Plaintiff's failure to intervene and deliberate indifference

claims. (*See* Docket No. 37 at 5-6 ¶¶ 3-6).  However, at his deposition, Plaintiff testified that in addition to being tased by Lindsay and kicked in the face by Leon-Martinez behind the Butcher Boys store, he was also "punched a few times" behind his head and kicked, and that he "believe[s]" Lindsay and the other Defendants may have done this. (Docket No. 106-1 at 48:10-16, 60:24-62:1).  A review of the entire transcript reveals that the basis for this belief is that (1) Plaintiff saw them in the general area behind the Butcher Boys store when he arrived or regained consciousness; (2) the assault "felt like" it involved "more than one [officer];" (3) at the start of the pursuit, Solomon "said [he] w[as] gonna kick [his] ass;" and (4) when Plaintiff regained consciousness, Solomon was breathing heavily, Davis was sweating, and Davis said Plaintiff "shouldn't have made him run like that." (*Id.* at 33:24-34:22, 48:24-49:15, 59:10-22, 60:24-64:14, 65:2-10).

The Court finds that the record fails to establish that Lindsay, Solomon, Davis and Ottino were directly involved in the alleged assault on Plaintiff. *See Djangmah v. Falcione*, No. 08 Civ. 4027(PAC)(FM), 2013 WL 208914, at *8 (S.D.N.Y. Jan. 18, 2013), *report and recommendation adopted*, 2013 WL 1195261 (S.D.N.Y. Mar. 25, 2013).  Plaintiff's argument that these Defendants directly participated constitutes speculation, which "is not a sufficient ground upon which to oppose summary judgment." *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 466 (N.D.N.Y. 2009); *see also Bermudez v. Edmonds*, 15-CV-3240 (KAM), 2017 WL 11507652, at *5 (E.D.N.Y. Dec. 19, 2017) (finding that plaintiff's testimony that he was "kicked and punched all over" by unidentified officers "until losing consciousness" did not support a non-speculative inference that defendant hit him "at some point after losing consciousness") (internal quotations omitted); *Carey v. Maloney*, 480 F. Supp. 2d 548, 557 (D. Conn. 2007) (holding that officer's "mere presence at the scene where [plaintiff]'s rights were allegedly violated" was insufficient to

sustain excessive force claim against him).  Plaintiff does not proffer any facts beyond

Defendants' presence that could provide the logical inferences needed to convince a rational jury

that they actually participated in the alleged assault. *Cf. Goenaga*, 51 F.3d at 18.

Accordingly, Defendants' motion for summary judgment with respect to any excessive

force claims against Ottino, Lindsay, Solomon and Davis *based on their direct participation in*

*the alleged assault* is granted.

### 3.  Failure to Intervene

On the other hand, "[a] police officer 'who does not personally inflict the injury at the

core of an excessive use of force claim may still be liable under § 1983 if the officer was present

at the assault, and fails to intervene to prevent the harm when the officer had a reasonable

opportunity to do so.'" *See Walker*, 2020 WL 606788, at *4 (quoting *Raffaele v. City of New*

*York*, 242 F. Supp. 3d 152, 156 (E.D.N.Y. 2017)).  Defendants argue that Plaintiff's failure to

intervene claim must be dismissed as to Ottino, Lindsay and Solomon because they were not

present when Plaintiff was apprehended and handcuffed. (Docket No. 96 at 14).  Defendants

further assert that they are entitled to summary judgment because, even assuming they were

present, there was no realistic opportunity for them to intervene in the tasing or alleged assault.

(*Id.* at 14-15; *see also* Docket No. 102 at 8).  Construed liberally, Plaintiff's opposition brief

contends that there are issues of material fact regarding this claim because he testified that the

Defendants were all present behind the Butcher Boys store while he was tased and assaulted, and

therefore, had plenty of opportunity to intervene. (Docket No. 100 at 9-10).

"A law enforcement officer has an affirmative duty to intercede on behalf of a citizen

whose constitutional rights are being violated in his presence by other officers." *O'Neill v.*

*Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).  "An officer who fails to intercede is liable for the

preventable harm caused by the actions of the other officers where that officer observes or has

reason to know: (1) that excessive force is being used . . . ; (2) that a citizen has been unjustifiably arrested . . . ; or (3) that any constitutional violation has been committed by a law enforcement official . . . ." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citing *O'Neill*, 839 F.2d at 11–12; *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982)).  Such liability attaches "only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill*, 839 F.2d at 11–12).  "Whether [an] officer ha[s] a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *See Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (quoting *Anderson*, 17 F.3d at 557).

As a general matter, "[a] defendant who is not in the vicinity of the alleged constitutional violation, especially an isolated violation that occurs within seconds, cannot be held liable because he lacked reasonable opportunity to intervene." *See Tafari v. McCarthy*, 714 F. Supp. 2d 317, 342 (N.D.N.Y. 2010); *see also Sammarco v. Hoolan*, No. 12-CV-7857 (JMF), 2014 WL 3639161, at *2 (S.D.N.Y. July 23, 2014) (granting summary judgment in light of undisputed evidence that defendants "were not involved in Plaintiff's arrest and not even present at the scene").  However, genuine disputes of material fact as to an officer's presence during an alleged assault may preclude summary judgment by begging the question whether the officer had an opportunity to intervene. *See, e.g.*, *Walker*, 2020 WL 606788, at *5; *Randle v. Alexander*, 170 F. Supp. 3d 580, 591 (S.D.N.Y. 2016).

Here, Defendants concede that Davis was present behind the Butcher Boys store when Leon-Martinez apprehended Plaintiff. (*See* Docket Nos. 94-12 ¶ 2; 96 at 13 n.7).  However, the parties dispute whether the rest of the Defendants were also present, and whether the tasing occurred in a wooded area at the beginning of the chase, with only Solomon present, or behind the Butcher Boys store as well. (*Compare* Docket Nos. 97 ¶¶ 26-29, 41-44; 94-12 ¶ 2; 96 at 13 n.7, *with* Docket No. 106-1 at 50:5-11, 52:20-22, 58:6-9, 62:12-24).  Although his testimony is rife with inconsistencies, Plaintiff stated under oath that he saw Ottino and Davis follow him from the parking lot to the back of the Butcher Boys store, and that both Lindsay and Solomon arrived when he kneeled to the ground, after which he laid down and Leon-Martinez kicked him in the face. (Docket No. 106-1 at 50:5-11, 52:20-22, 54:7-17, 57:18-58:16, 62:12-24).  Therefore, according to Plaintiff, all of the Defendants were present at least before Leon-Martinez assaulted him behind the store. (*Id.* at 57:18-58:16).  Plaintiff also offered testimony that he "could have been" tased while he was "on [his] knees." (*Id.* at 53:21-54:1); *see supra* n.9.

Construing Plaintiff's testimony in his favor, a reasonable jury could find that all of the Defendants except Ottino[21] arrived behind the store before both the tasing and assault began. This evidence, while thin, is sufficient to create a genuine dispute of material fact as to their presence during any alleged uses of excessive force. *See Randle*, 170 F. Supp. 3d at 591 (denying summary judgment where "[t]he parties . . . genuinely dispute[d] a material fact, namely, whether C.O. Nelson was present at any point during the second fight").  Of course, the jury may also doubt the veracity of Plaintiff's proffered sequence of events in light of Defendants'

---

[21] In light of the robust objective evidence that Ottino was off duty at the time of the arrest, no reasonable juror could find that he was present behind the Butcher Boys store during the alleged excessive uses of force. (*See* Docket No. 94-5).  Therefore, Plaintiff's failure to intervene claim against Ottino is dismissed. *See Demosthene v. City of New York*, 831 F. App'x 530, 535 (2d Cir. 2020) (summary order) (upholding summary judgment as to excessive force and failure to intervene claims where "a record of the line-up" during which alleged assault occurred "demonstrate[d] that [defendant] was not present when the line-up was conducted").

assertions that both Solomon and Lindsay only arrived after being called to the location over the police radio. (Docket Nos. 94-5; 94-11 ¶¶ 3-4; 94-12 ¶¶ 3-4; 97 ¶¶ 42-43).  Indeed, it is not the Court's role to make these credibility determinations.

Nevertheless, an officer's "mere presence" at the scene of an arrest "cannot be considered a proximate cause of [the plaintiff]'s injuries without any evidence that she had an opportunity to prevent" the alleged excessive use of force. *See Howard v. Schoberle*, 907 F. Supp. 671, 682 (S.D.N.Y. 1995).  Indeed, a failure to intervene claim requires that a defendant had a "*realistic opportunity* to intervene to prevent the harm from occurring." *Raffaele*, 242 F. Supp. 3d at 156 (quoting *Anderson*, 17 F.3d at 557) (internal quotations omitted) (emphasis added); *see also Jean-Laurent*, 540 F. Supp. 2d at 512.  "Whether an officer had a realistic opportunity to intervene depends on several factors, including the number of officers present, their proximity to the situation, the environment in which they acted, the nature of the assault, and, often most important, the assault's duration." *Burks v. City of New York*, No. 17-cv-00177 (ARR) (RLM), 2018 WL 6199550, at *5 (E.D.N.Y. Nov. 28, 2018) (quoting *Merrill v. Schell*, 279 F. Supp. 3d 438, 444 (W.D.N.Y. 2017)).  The Second Circuit has cautioned that whereas the duration of the assault is "always relevant" and may be of "great importance," there is no "hard-and-fast temporal cutoff" for satisfying this standard, and courts must be cognizant that other circumstances "might bear significantly on an officer's ability to stop [the assault] from happening" based on the unique facts in each case. *See Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016).

According to Defendants, assuming, *arguendo*, that Leon-Martinez kicked Plaintiff in the face, the rest of the Defendants lacked sufficient time to stop Leon-Martinez because by Plaintiff's account, Leon-Martinez was the first officer to reach him behind the Butcher Boys

store and "the first thing [the officer] did" was kick Plaintiff. (Docket Nos. 96 at 14-15; 106-1 at 50:3-4, 91:24-92:4).  They further argue that in light of the "quick nature of" the tasing and the kick, there is insufficient evidence as to the actions the officers could have taken to prevent the alleged harm. (Docket No. 102 at 8).

Plaintiff testified that the entire pursuit from East Broadway, where the Mountain Mall is located, to the moment of his arrest behind the store, lasted no longer than five minutes. (Docket No. 106-1 at 51:21-52:8; *see also* Docket No. 94-11 ¶ 3).  Plaintiff further testified that he was tased before the assault, either when he was still running or when he was on his knees behind the store. (Docket No. 106-1 at 53:21-54:1).  Plaintiff maintains that he dropped to his knees "like seconds" before Leon-Martinez reached him. (*Id.* at 52:9-12).  He could not recall how much time passed between Leon-Martinez's alleged kick and the moment when he was placed in Leon-Martinez's vehicle. (*Id.* at 62:2-5).  However, he testified that after the first kick, he was "punched a few times" and kicked again. (*Id.* at 48:10-16, 61:21-62:1).  Moreover, he asserts he was "placed in handcuffs" as the beating continued. (*Id.* at 51:19-20).

Plaintiff was not specifically questioned about the Defendants' precise locations behind the store when he was allegedly tased and kicked, and there is little evidence of the area's size or topography.  The most specific evidence on record of the officers' proximity to Plaintiff during the incident is Plaintiff's testimony that he saw Davis and Ottino behind the store "around the time [he] arrived," and before he lost consciousness, he saw them standing ten or fifteen feet away from him. (*Id.* at 62:12-63:15).  He was unsure whether they arrived before him, as "all the other officers came from the o[pposite] side" of the Butcher Boys building. (*Id.* at 63:20-64:9). However, the reason he dropped to his knees is that he was "surrounded" by the rest of the

officers. (*Id.* at 50:8-9). When he regained consciousness, he saw Davis's "face" up-close as he was being placed into Leon-Martinez's vehicle. (*Id.* at 58:17-59:16).

In light of this testimony, there is a dispute as to whether Davis, Solomon and Lindsay had a realistic opportunity to intervene in the alleged beating *after* Leon-Martinez's first kick. As to the tasing and the alleged initial kick, the record indicates that these single, rapid events occurred spontaneously and without warning. By Plaintiff's own account, Leon-Martinez was the first officer to reach him, and mere "seconds" passed between the time when Plaintiff dropped to his knees and Leon-Martinez kicked him. (Docket No. 106-1 at 50:3-4, 52:9-12, 91:24-92:4). Thus, no reasonable juror could find that any officer present at the scene could have anticipated or stopped these alleged discrete uses of force. *See, e.g.*, *Raffaele*, 242 F. Supp. 3d at 158 (granting summary judgment on failure to intervene claim because "there was not enough time for any officer, from a distance of six to ten feet, to intervene between a push and a hit occurring in a two-second span"); *Elufe v. Aylward*, No. 09-CV-458(KAM)(LB), 2011 WL 477685, at *9 (E.D.N.Y. Feb. 4, 2011) ("Where the alleged force consists of a single push or a 'rapid succession' of blows, courts have found that the officer did not have a realistic opportunity to intervene.") (citing *O'Neill*, 839 F.2d at 11–12).

However, drawing all reasonable inferences in Plaintiff's favor, there is sufficient evidence that the above three Defendants had a realistic opportunity to intervene in the further beating Plaintiff alleges he received after Leon-Martinez's kick. Although Plaintiff could not remember how long the beating lasted, he testified that after the initial kick, he was punched more than once and kicked at least once again in the presence of these officers, and for some of that period, he was handcuffed. (*Id.* at 48:10-16, 51:19-20, 61:21-62:1, 62:2-5). A reasonable juror could accept Plaintiff's version and find that the amount of time it took to punch Plaintiff

multiple times before and after handcuffing him could have been sufficient for the Defendants to stop any further blows.  This evidence raises a question of material fact whether the duration of the assault, and the officers' proximity to Plaintiff, gave them a realistic opportunity to intervene. *See Buie*, 2015 WL 6620230, at *8 (holding that "while the initial use of force . . . happened too quickly for intervention, a reasonable jury could conclude that . . . defendants had time to intercede and were capable of preventing some of the harm caused" when detectives subsequently pushed plaintiff's arms upwards and pressed her face into the wall); *Jones v. City of Hartford*, 285 F. Supp. 2d 174, 183 (D. Conn. 2003) (finding issue of material fact as to realistic opportunity to intervene where "[o]n the plaintiff's facts, the kneeing and process of unbuckling and pulling down [his] pants would have taken enough time to . . . give[] the other officers, who . . . could have seen what was occurring, a reasonable opportunity to intervene").  That said, the jury could also find that one or more of these officers was not present, or that the further blows were delivered too quickly for these officers to intervene.  The task of weighing the parties' conflicting evidence will require a determination as to these Defendants' credibility, on the one hand, and Plaintiff's, on the other.  Because it is not the Court's role to engage in this exercise, summary judgment on Plaintiff's failure to intervene claim against Davis, Lindsay and Solomon must be denied.

## B.  Deliberate Indifference to Medical Needs

Defendants contend that Plaintiff's deliberate indifference claims fail because he was never denied medical care, nor was his broken eye socket sufficiently serious to trigger such liability. (Docket No. 96 at 10-11).  Defendants further argue that there is no evidence that Davis or Ottino acted with the requisite state of mind to sustain this claim, and they are otherwise entitled to qualified immunity. (*Id.* at 11-13 & n.6).  Plaintiff maintains that (1) his broken eye socket was sufficiently serious because only surgery will correct it; (2) both officers had

knowledge of his injury because they saw him being assaulted; and (3) they refused to take him to the hospital until after they interrogated him. (Docket No. 100 at 6-8; *see also* Docket No. 106-1 at 74:3-10).  Moreover, according to Plaintiff, Davis intended to delay medical assistance as a "punish[ment]" in light of his statement: "You shouldn't have made me run like that, asshole." (Docket No. 100 at 7-8).  In response, Defendants assert that even assuming Plaintiff's medical treatment was delayed, Davis and Ottino are entitled to judgment as a matter of law because (1) Plaintiff's broken eye socket was not a life-threatening or fast-degenerating condition, nor did any delay create any particular risk; and (2) there is no evidence that either Defendant was aware or should have been aware of any such risk. (*See* Docket No. 102 at 3-7).

A pre-trial detainee's claim for deliberate indifference to serious medical needs is evaluated under the Due Process Clause of the Fourteenth Amendment. *Davis v. McCready*, 283 F. Supp. 3d 108, 116 (S.D.N.Y. 2017) (citing *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)). "[W]hen a claim arises under the Fourteenth Amendment, 'the pre-trial detainee must prove that the defendant-official acted intentionally . . . or recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety.'" *Ryan v. Cty. of Nassau*, 12-CV-5343(JS)(SIL), 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) (quoting *Darnell*, 849 F.3d at 35).  To establish a claim for deliberate indifference to serious medical needs under the Fourteenth Amendment, a plaintiff must satisfy both objective and *mens rea* components. *Davis*, 283 F. Supp. 3d at 116.

The objective standard has two prongs.  "The first prong is whether the prisoner was actually denied adequate medical care." *James v. Correct Care Sols.*, No. 13-cv-0019(NSR), 2013 WL 5730176, at *4 (S.D.N.Y. Oct. 21, 2013) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)); *see Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. Oct. 18, 2018)

(summary order) (noting that "[f]or Fourteenth Amendment claims, this Court applies the same standard as the Eighth Amendment to determine whether an alleged action is objectively serious enough to be a constitutional violation").  The second prong of the objective standard is "whether the 'medical condition is sufficiently serious.'" *Figueroa v. Cty. of Rockland*, 16-cv-6519 (NSR), 2018 WL 3315735, at *5 (S.D.N.Y. July 5, 2018) (quoting *Salahuddin*, 467 F.3d at 280).  To establish that the medical condition was sufficiently serious, a plaintiff must show "the existence of 'a condition of urgency, one that may produce death, degeneration, or extreme pain[.]'" *Id.* at *4 (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)); *see also Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.") (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (internal quotations omitted).

However, where, as here, "a detainee's deliberate indifference claim involves delay in treatment, not denial of treatment, the analysis of the medical need 'focus[es] on the challenged *delay* . . . rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious.'" *Martinez v. City of New York*, 16-CV-79 (RPK) (CLP), 2021 WL 4502440, at *10 (E.D.N.Y. Sept. 30, 2021) (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)) (emphases in original).  "The absence of adverse medical effects or demonstrable physical injury is one . . . factor that may be used to gauge the severity of the medical need at issue." *Smith*, 316 F.3d at 187.  Indeed, the "seriousness of a delay in medical treatment may be decided by reference to the effect of delay in treatment . . . [c]onsequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and

considering the reason for delay." *See Thurmond v. Thomas-Walsh*, No. 18-CV-409 (KMK),

2019 WL 1429559, at *6 (S.D.N.Y. Mar. 29, 2019) (quoting *Smith*, 316 F.3d at 185) (internal

quotations omitted).  Nevertheless, even without evidence that a delay in treatment worsened the

condition, "allegations of a 'condition of urgency' that 'may produce . . .  extreme pain' satisfy

the objective prong of the analysis." *See Martinez*, 2021 WL 4502440, at *10 (quoting *Dotson v.*

*Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (summary order)).

       In *Darnell v. Pineiro*, the Second Circuit modified the *mens rea* component for deliberate

indifference claims brought under the Fourteenth Amendment. *See* 849 F.3d at 35; *see also Lloyd*

*v. City of New York*, 246 F. Supp. 3d 704, 718 (S.D.N.Y. 2017) ("The reasoning of *Darnell*

applies equally to claims of deliberate indifference to serious medical needs under the Fourteenth

Amendment.").  Since *Darnell*, courts must determine "whether an objectively reasonable person

in Defendant's position would have known, or should have known, that Defendant's actions or

omissions posed an excessive risk of harm to [Plaintiff]." *Davis*, 283 F. Supp. 3d at 120 (citing

*Darnell*, 849 F.3d at 35; *Lloyd*, 246 F. Supp. 3d at 719).  "In other words, the second element of

a deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a

plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or

omissions) have subjected the pre-trial detainee to a substantial risk of harm.'" *Ryan*, 2018 WL

354684, at *3 (quoting *Darnell*, 849 F.3d at 35) (alteration in original).  Nevertheless, "[a]

detainee must prove that an official acted intentionally or recklessly, and not merely

negligently." *Darnell*, 849 F.3d at 36.  Whether a defendant acted with the requisite state of mind

"is a question of fact subject to demonstration in the usual ways, including inference from

circumstantial evidence." *Martinez*, 2021 WL 4502440, at *11 (quoting *Charles v. Orange Cty.*,

925 F.3d 73, 87 (2d Cir. 2019) (internal quotations omitted)); *see also Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The record before the Court is insufficient to sustain either component of this exacting standard.[22] *Cf. Madera v. Ezekwe*, No. 10 CV 4459(RJD)(LB), 2013 WL 6231799, at *11 (E.D.N.Y. Dec. 2, 2013) ("Deliberate indifference is a very high standard."). As to the objective component, although Plaintiff required emergency treatment, Davis and Ottino's conduct does not rise to the level of egregiousness required to succeed on a deliberate indifference claim based on delayed treatment. Indeed, Plaintiff was not actually denied care; rather, he received care almost immediately after being arrested. Davis arranged for Mobile Medic to examine Plaintiff less than ten minutes after he arrived at the precinct, and to examine him again approximately twenty-four minutes after Plaintiff requested further treatment that evening. (Docket Nos. 94-6 at 4, 7; 97 ¶¶ 25, 46-47, 52-53; 94-8). Mobile Medic transported Plaintiff to the hospital approximately twelve minutes after they examined him a second time. (Docket No. 94-6 at 7). Courts within this Circuit generally limit finding deliberate indifference based on such delays in treatment to "cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast-degenerating condition for three days; or delayed major surgery for over two years." *See Freeman v. Strack*, No. 99 Civ. 9878(AJP), 2000 WL 1459782, at *7 (S.D.N.Y. Sept. 29, 2000) (quoting *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999)) (internal quotations omitted); *see also Munoz v. Eliezer*, 16-cv-6049 (NSR), 2018 WL 1626170, at *6 (S.D.N.Y. Mar. 30, 2018).

---

[22] As set forth *infra*, because the record is insufficient to support the objective or subjective components of Plaintiff's deliberate indifference claim, the Court does not reach the issue of qualified immunity. (*See* Docket No. 96 at 12-13 n.6).

The facts here do not bear out any of these scenarios, nor do they support Plaintiff's assertion that "his body was racked with pain" to a point of severity that would otherwise trigger liability. (Docket No. 100 at 7); *cf. Martinez*, 2021 WL 4502440, at *10. The medical records do not classify Plaintiff's broken eye socket as "life-threatening" or "fast-degenerating," nor do they identify a concussion or any other severe issues that required immediate attention. Although Plaintiff testified that at some point, he was told that his broken eye socket required surgery, (Docket No. 106-1 at 85:24-87:19), Dr. Peace's notes from his visit to Albany on the evening of the incident state that there was no "urgent need to consult" the facial surgeon on call, (Docket No. 101-1). The record is clear that Mobile Medic treated him shortly after arrival at the precinct, and again less than five hours later. (Docket No. 94-6 at 7). There is no evidence that this delay exacerbated his condition or pain. Moreover, Plaintiff's first examination – which he initially refused – did not indicate any pain or medical conditions beyond scratches, "mild" blurred vision, and a broken blood vessel. (*Id.* at 4).

Courts have consistently rejected deliberate indifference claims under similar circumstances, involving relatively brief delays or interruptions in treatment and a dearth of evidence that the plaintiff's pain or medical condition worsened as a result. *See, e.g.*, *Davis v. Furey*, No. 3:19-CV-1867 (JCH), 2021 WL 2827366, at *6 (D. Conn. July 6, 2021) ("Davis has not presented any evidence that he experienced any serious risk of harm as a result of the asserted two-hour delay in receiving treatment . . . ."); *Liverpool v. Davis*, 442 F. Supp. 3d 714, 737 (S.D.N.Y. 2020) (granting summary judgment where plaintiff waited three hours for medical treatment but did "not allege[] that the delay in treatment caused his condition to worsen"); *Rodriguez v. Mercado*, No. 00 CIV. 8588 JSRFM, 2002 WL 1997885, at *9 (S.D.N.Y. Aug. 28, 2002) (dismissing deliberate indifference claim based on eight or nine-hour delay, and noting

that patients "seeking care for a non-life-threatening injury generally experience[] some delay in receiving treatment").  In addition, although there is evidence that Plaintiff was in pain at some point while awaiting treatment, (Docket No. 106-1 at 66:9-13, 67:2-6), his sporadic complaints as well as ability to hold a conversation during the interview indicate that he was not in the type of "extreme pain" that may otherwise satisfy the objective prong of the analysis. *Compare Martinez*, 2021 WL 4502440, at *10 (finding objective prong satisfied on summary judgment in light of evidence that plaintiff was "screaming and crying" for hours and repeatedly told an officer that she was in too much pain to be fingerprinted), *with Benitez v. Pecenco*, No. 92 Civ. 7670 (DC), 1995 WL 444352, at *3 (S.D.N.Y. July 27, 1995) (granting summary judgment where "nothing in the record . . . suggest[ed] that plaintiff's back pain was severe or excruciating[,]" no medical personnel noted he was in "acute distress or had any difficulty standing or walking[,]" and his complaints were "only sporadic[]").  Neither Mobile Medic nor any hospital staff noted any pain-related lapses in Plaintiff's functioning or complaints of excruciating pain at any of his examinations. *See Benitez*, 1995 WL 444352, at *3.  Therefore, Plaintiff's "subjective claims of . . . pain, unaccompanied by substantial medical complications," are inadequate to create a genuine dispute of material fact as to whether his condition was sufficiently serious to warrant more immediate treatment. *See Brown v. White*, No. 9:08-cv-200 (GLS/ATB), 2010 WL 985184, at *10 (N.D.N.Y. Mar. 15, 2010) (internal quotations omitted).

Moreover, although Plaintiff alleges that Davis's comments demonstrate an "intent to punish" him "by making him wait unreasonably for medical assistance," (Docket No. 100 at 7-8), this conclusory assertion is not enough to withstand dismissal.  According to Plaintiff, Davis told him that he "shouldn't have made [Plaintiff] run like that" when he was putting Plaintiff into Leon-Martinez's vehicle after the assault. (Docket No. 106-1 at 57:12-17)  However, it is

undisputed that Davis and Leon-Martinez arranged for Plaintiff's examination at the precinct shortly thereafter. (Docket Nos. 94-6 at 4; 97 ¶ 46; 100 at 3 ¶ 14).  Therefore, no rational jury could conclude that Davis intended to delay Plaintiff's treatment when he made the subject comment.  There is no indication that Davis made any similar comments upon Plaintiff's requests for further treatment.  Absent any such evidence specifically connecting the alleged delay of Plaintiff's treatment to an improper motive, Plaintiff's claim cannot survive on this basis. *Compare Benitez v. Beneway*, No. 93 Civ. 3132 (DC), 1995 WL 489694, at *6 (S.D.N.Y. Aug. 15, 1995) (holding that "[n]o reasonable jury could conclude" that defendant ordered the filing of a misbehavior report in order "to terminate [plaintiff's] prescribed physical therapy treatment in retaliation" for plaintiff's complaint, based only on the "temporal proximity between the mailing of the complaint . . . and the issuance of the misbehavior report") (internal quotations omitted), *with Cumberbatch v. Port Auth. of New York & New Jersey*, No. 03 Civ. 749(BSJ), 2006 WL 3543670, at *2, *9 (S.D.N.Y. Dec. 5, 2006) (finding genuine issues of material fact as to officers' intent to delay treatment as punishment due to evidence that "continued requests for medical attention were met with" an officer's reply that "they wanted him to 'marinate'").

For similar reasons, the record is inadequate to support the subjective component of Plaintiff's deliberate indifference claims.  Even if Plaintiff requested medical treatment as early as being placed in the holding cell after his initial examination, (*see* Docket No. 106-1 at 66:9-13, 67:2-6), there is no evidence upon which a reasonable jury could find that at that time, Ottino and Davis knew or should have been aware that Plaintiff had a serious medical condition that required timely treatment. *See Darnell*, 849 F.3d at 35.  To the contrary, Mobile Medic's initial examination did not reveal any serious medical issues that required immediate transportation to the emergency room. (Docket No. 94-6 at 4).  Furthermore, there is no indication that Plaintiff's

condition deteriorated until the middle of the interview when Plaintiff repeatedly complained about his eye and it began to bleed – which prompted Davis to obtain further care approximately twenty minutes later. (Docket Nos. 94-6 at 7; 94-8).  None of these facts suggest that either officer knew or should have known of the seriousness of Plaintiff's condition earlier in this sequence of events, or specifically intended to delay care. *See Boyd v. Deasis*, 524 F. Supp. 3d 128, 148 (W.D.N.Y. 2021) (dismissing deliberate indifference claim on summary judgment where defendants "called medical shortly after Plaintiff sustained his injury"); *Vines v. McCrystal*, No. 3:18cv1432(MPS), 2020 WL 4818562, at *7–8 (D. Conn. Aug. 19, 2020) (granting summary judgment based on undisputed evidence that defendant knew that plaintiff's injury had been treated earlier that day and that plaintiff had been instructed to seek further treatment that evening).

Accordingly, Defendants' motion for summary judgment regarding Plaintiff's deliberate indifference claims is granted in its entirety.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Plaintiff's excessive force claim against Leon-Martinez, and his failure to intervene claims against Solomon, Lindsay and Davis, survive.  The Court dismisses Plaintiff's failure to intervene claim against Ottino, and his deliberate indifference claims against Davis and Ottino.  Finally, Plaintiff's claims that Davis, Solomon, Lindsay and Ottino also personally participated in excessive force are dismissed.  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. The Clerk is respectfully requested to terminate the

pending Motion (Docket No. 93), and mail a copy of this Opinion and Order to the *pro se* Plaintiff.

Dated:   February 7, 2022
         White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge